## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

|  |  |
|---|---|
| ANGELA LUMPKIN, | CASE NO. 1:24-CV-00396-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION & ORDER** |
| COMMISSIONER SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

### INTRODUCTION

Plaintiff Angela Lumpkin challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On March 4, 2024, under Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated March 4, 2024). Subsequently, all parties consented to my exercising jurisdiction over this matter under 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure (ECF #10), and on April 30, 2024, the matter was re-assigned to me for disposition (non-document entry dated April 30, 2024). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for additional proceedings.

### PROCEDURAL BACKGROUND

This case concerns Ms. Lumpkin's third application for benefits. Ms. Lumpkin first applied for SSI in March 2013, alleging a disability beginning in January 2006. (*See* Tr. 243). After an ALJ determined Ms. Lumpkin was not disabled, the Appeals Council denied her request for review.

1

Ms. Lumpkin filed her second SSI application on December 3, 2019, alleging a disability beginning in July 2010. (*See id.*). The ALJ again determined Ms. Lumpkin was not disabled. (*See* Tr. 243-58). After the Appeals Council declined to review, Ms. Lumpkin filed a Complaint in this Court challenging the Commissioner's final decision. *Lumpkin v. Comm'r of Soc. Sec.,* No. 1:21-CV-481, 2022 WL 624724 (N.D. Ohio March 3, 2022). On April 5, 2022, Ms. Lumpkin filed a third application for SSI alleging a disability beginning on September 24, 2020. (Tr. 366-67). The claim was denied initially and on reconsideration. (Tr. 262-68, 270-77). Ms. Lumpkin then requested a hearing before an administrative law judge. (Tr. 295-98). Ms. Lumpkin (represented by counsel) and a vocational expert (VE) testified before the ALJ on April 5, 2023. (Tr. 220-39). On April 21, 2023, the ALJ determined Ms. Lumpkin was not disabled. (Tr. 197-219). On January 10, 2024, the Appeals Council denied Ms. Lumpkin's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1; *see* 20 C.F.R. § 404.981). Ms. Lumpkin then timely filed this action on March 3, 2024. (ECF #1).

Factual Background

I.      **Personal and Vocational Evidence**

Ms. Lumpkin was 42 years old on the disability-onset date and 44 years old at the hearing. (*See* Tr. 262). She completed two years of college and worked part-time as an assistant in a medical office from 2013 to 2015 and as a floor associate in a large retail store for three months in 2015. (Tr. 392).

II.     **Relevant Medical Evidence**

On March 31, 2020, Ms. Lumpkin followed up with rheumatologist Shailey Desai, M.D. (Tr. 574). Dr. Desai's notes provide some of Ms. Lumpkin's medical history. (*Id.*). Ms. Lumpkin

endorsed photosensitivity from childhood. (*Id.*). In 2009, she developed right leg pain and around 2012, she developed pain in both wrists and in the metacarpophalangeal (MCP) joints of both hands, and a rash over her left arm. (*Id.*). A skin biopsy was consistent with systemic lupus erythematosus.[1] (*Id.*). Her provider prescribed hydroxychloroquine but the rash continued to spread to other areas. (*Id.*). Prednisone, which Ms. Lumpkin took between 2012 and 2015, was also ineffective on the rash, though she does not recall if it helped with her joint pain. (*Id.*). For her leg pain, Ms. Lumpkin tried gabapentin, but it made her sleepy and was ineffective. (*Id.*). Cymbalta and Paxil were also ineffective. (*Id.*). In February 2019, Ms. Lumpkin established care at the Cleveland Clinic Foundation and started taking amitriptyline for fibromyalgia symptoms. (*Id.*). In March 2019, Ms. Lumpkin's eye examination was normal. (*Id.*). In August 2019, she reported a persistent rash on her left arm and continued sciatic pain on the right side. (*Id.*). She described better sleep with amitriptyline. (*Id.*). Ms. Lumpkin received methotrexate for lupus symptoms but stopped after a few months because of side effects. (*Id.*).

That day, Ms. Lumpkin reported diffuse joint pain. (*Id.*). For lupus, Dr. Desai ordered Ms. Lumpkin to continue taking hydroxychloroquine. (Tr. 577). Ms. Lumpkin deferred Dr. Desai's offer to consider other medications. (*Id.*). The doctor determined Ms. Lumpkin's Widespread Pain

---

[1] An autoimmune disease that causes the immune system to damage organs and tissues throughout the body. Common symptoms include joint pain, muscle pain, chest pain, rashes, fever, hair loss, mouth sores, fatigue, and swelling. *Lupus (Systemic Lupus Erythematosus)*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/4875-lupus (last accessed Nov. 5, 2024).

Index and Symptom Severity Scale scores were consistent with fibromyalgia[2] and advised her to continue taking amitriptyline and Flexeril. (*Id.*).

On May 12, 2020, Ms. Lumpkin experienced a flare up in back pain and called Dr. Desai's office to request additional medication. (Tr. 572).

On June 11, 2020, Ms. Lumpkin called Dr. Desai to request a different medication to address her fibromyalgia symptoms because naproxen was not helping. (Tr. 570). Dr. Desai scheduled Ms. Lumpkin for a virtual appointment with her nurse practitioner the following day to discuss medication adjustments. (*Id.*). On June 12, Ms. Lumpkin spoke to certified nurse practitioner Deshawn Jones and complained of fatigue, worsening lower back pain, and right leg pain with swelling. (Tr. 566). Ms. Lumpkin reported naproxen caused heartburn. (*Id.*). NP Jones discontinued naproxen and prescribed Mobic and a Medrol Pak (prednisone) for back pain and lupus symptoms. (Tr. 568-69). He advised her to avoid taking Mobic or other NSAIDs while taking prednisone. (Tr. 568). He also referred Ms. Lumpkin for a spinal evaluation. (Tr. 569).

Lumbar X-rays from June 25, 2020, showed mild narrowing and mild facet degenerative changes at L5-S1. (Tr. 657-58).

On June 26, 2020, Dr. Desai prescribed another course of prednisone. (Tr. 563).

On July 30, 2020, Ms. Lumpkin met with physician's assistant Alfred Melillo for a surgical consultation. (Tr. 557). She described a nine-year history of lumbar issues and reported right lower back, buttock, and calf pain that worsened in the past two months. (Tr. 558). According to Ms.

---

[2] A chronic disorder that causes pain, described as burning, aching and throbbing, and tenderness throughout the body, as well as fatigue and trouble sleeping. People with the disorder have an increased sensitivity to pain. *Fibromyalgia*, National Institute of Arthritis and Musculoskeletal and Skin Diseases, https://www.niams.nih.gov/health-topics/fibromyalgia (last accessed Nov. 5, 2024).

Lumpkin, she has dull, aching, throbbing pain in her low back that radiates from the right buttock to the right lateral thigh and calf, with numbness and tingling down the right leg. (*Id.*). She also reported feeling leg weakness with prolonged standing and walking. (*Id.*). Motor, sensory, and gait testing were normal. (Tr. 561). After reviewing Ms. Lumpkin's lumbar X-ray, PA Melillo assessed her with lumbar spondylosis and probable L5 radiculopathy on the right side. (*Id.*). Pending review of the MRI, he would consider epidural steroid injections. (*Id.*). He ordered a lumbar MRI and, after discussion with Dr. Desai, provided a trial dose of Lyrica. (*Id.*).

On August 12, 2020, PA Melillo's nurse informed Ms. Lumpkin that she needed to do six weeks of physical therapy before insurance would approve her lumbar MRI. (Tr. 557). Ms. Lumpkin declined to attend physical therapy because of the risk of COVID-19 and decided to search for other conservative measures because she did not want injections. (*Id.*).

On September 2, 2020, Ms. Lumpkin met with NP Jones and complained of stiffness and severe pain in her hands, shoulders, low back, and right leg, and denied joint swelling. (Tr. 551). She did not notice any improvement with Lyrica. (*Id.*). Ms. Lumpkin tolerated all her medications, including hydroxychloroquine, Mobic, Flexeril, and amitriptyline. (*Id.*). Before the appointment, Ms. Lumpkin completed a review of systems and endorsed dry mouth, mouth sores, eye dryness, occasional chest pain, leg swelling, joint pain and stiffness, muscle weakness, muscle aches, joint swelling, morning joint stiffness, a rash on her left shoulder, sensitivity to the sun, skin color changes, hair loss, headaches, numbness in her toes and hands, memory loss, and swollen glands. (Tr. 551-52). NP Jones performed a limited examination and observed an erythematous rash on her left arm. (Tr. 553). NP Jones advised Ms. Lumpkin to continue taking hydroxychloroquine, Mobic, and Lyrica. (Tr. 555).

On September 22, 2020, Ms. Lumpkin attended her first physical therapy session. (Tr. 547). She endorsed constant low back and right leg pain that feels better with heat, hot showers, lying on her back, and massage. (Tr. 548). Mobic and Flexeril sometimes help but she did not take them today because they make her sleepy. (*Id.*). She described living with her adult son and said she can sometimes do household chores. (*Id.*). Ms. Lumpkin stated that she did not have pain during treatment, but the pain returned to 7 on a 10-point pain scale after treatment. (Tr. 549).

On October 12, 2020, PA Melillo prescribed a TENS unit. (Tr. 547).

On October 20, 2020, Ms. Lumpkin attended her second physical therapy session where she demonstrated slight improvement and endorsed reduced pain after treatment. (Tr. 543). Ms. Lumpkin did not return for additional sessions and was discharged from care on March 4, 2021. (Tr. 545).

On November 10, 2020, Ms. Lumpkin presented at a telehealth visit with Dr. Desai and reported no improvement. (Tr. 539). Dr. Desai advised Ms. Lumpkin to continue taking her medications as prescribed. (Tr. 541-42).

On December 14, 2020, Ms. Lumpkin met with NP Jones for a follow-up appointment where she described pain in her hands, hips, lower back, right leg and knee, intermittent joint swelling in her right thumb, and early morning stiffness lasting one to two hours. (Tr. 528-29). She also endorsed pain with breathing, joint pain or stiffness, a rash on her left shoulder, skin color changes, hair loss, numbness in the bilateral lower extremities, hands, and feet, and memory loss. (Tr. 529). NP Jones observed hyperpigmented discoloration on her left arm. (Tr. 530). The physical examination revealed tenderness to the bilateral shoulders, elbows, MCP joints, knees,

6

and metatarsophalangeal (MTP) joints in the feet, cervical and lumbar spine, bilateral sacroiliac joints, upper and lower extremity muscles, and bilateral hips. (Tr. 530-31). In addition, Ms. Lumpkin demonstrated tenderness in all 18 fibromyalgia-related trigger points. (Tr. 531). NP Jones advised her to continue her medications. (*Id.*).

On February 2, 2021, Ms. Lumpkin presented at a telehealth visit with Dr. Desai where she reported significant pain in her right thumb, hand, knee, and leg, pain at the back of her head, and pain from a knot in her right calf. (Tr. 522-23). Dr. Desai advised Ms. Lumpkin to continue taking her medications and ordered an ultrasound of the right leg to evaluate for deep vein thrombosis. (Tr. 526).

On February 8, 2021, a venous duplex ultrasound of Ms. Lumpkin's right leg was normal. (Tr. 606-07).

On March 6, 2021, Ms. Lumpkin presented at an urgent-care clinic after a car accident. (Tr. 520). She reported lower-back pain and, on physical examination, demonstrated tenderness to palpation at L2-S1, a positive straight-leg-raise test on the right, muscle spasms, antalgic gait, and limited range of motion with flexion and extension. (*Id.*). Updated lumbar X-rays showed mild intervertebral disc space loss and endplate sclerosis. (Tr. 646). The interpreting physician determined Ms. Lumpkin's lower-back condition remained stable when compared with the X-rays from June 2020. (*Id.*). The treating provider advised Ms. Lumpkin to rest, use warm compresses, and continue her medications. (Tr. 521).

On March 11, 2021, Ms. Lumpkin followed up with PA Melillo. (Tr. 519). Ms. Lumpkin again declined to pursue epidural steroid injections in favor of more conservative management. (*Id.*).

On August 20, 2021, Ms. Lumpkin presented at a telehealth visit with NP Jones where she reported stable, unchanged symptoms, including pain in the left arm, right leg, and bilateral knees, with swelling lasting two to three hours in the early morning, intermittent chest pain, nausea, intermittent mouth sores, photosensitivity, and hair loss. (Tr. 508-09). NP Jones advised Ms. Lumpkin to continue her medications as prescribed. (Tr. 511-12). On August 23, 2021, NP Jones referred Ms. Lumpkin to a podiatrist. (Tr. 507).

On September 30, 2021, Ms. Lumpkin met with podiatrist Christopher Herbert, DPM, for evaluation of right heel pain around the Achilles tendon insertion. (Tr. 505). Dr. Herbert's physical examination showed some tenderness with palpation to the medial aspect of the right heel above the fat pad and the Achilles tendon medial insertion region. (Tr. 506). The examination was otherwise normal. (*Id.*). An X-ray of Ms. Lumpkin's right foot revealed no significant abnormality, but the interpreting physician made note of retrocalcaneal enthesopathy at the Achilles tendon insertion. (Tr. 642). Dr. Herbert reviewed the X-ray and stated there were no appreciable findings except reduced fat pad thickness. (Tr. 506). He assessed Ms. Lumpkin with plantar fat pad atrophy with developing chronic right heel pain and recommended wearing heel cups and icing her foot for 10 to 15 minutes a couple times a day. (*Id.*).

Ms. Lumpkin returned to Dr. Herbert's office on November 18, 2021, and reported continued pain despite using the heel cups and taking Mobic. (Tr. 499). Dr. Herbert prescribed a fiberglass walking cast for immobilization. (*Id.*). The walking cast caused pain in her shin, so she was fitted for a foam walker. (*Id.*).

On December 17, 2021, Ms. Lumpkin presented at a telehealth visit with NP Jones and complained of continued pain in the right heel, right leg, and bilateral knees, intermittent joint

swelling in her hands, and stiffness lasting all day. (Tr. 493). NP Jones advised her to continue her medications as prescribed. (Tr. 498).

On March 16, 2022, Ms. Lumpkin returned to Dr. Herbert's office for evaluation of her continued right heel pain. (Tr. 480). On physical examination, Ms. Lumpkin had maximum tenderness with palpation of the plantar medial aspect of the right heel. (Tr. 481). Updated right foot X-rays showed a retrocalcaneal spur and a flat foot. (Tr. 625). Dr. Herbert ordered an MRI to evaluate possible nerve entrapment, bone marrow edema, and plantar fasciitis. (Tr. 481).

On April 29, 2022, Ms. Lumpkin attended a physical therapy session where she complained of right heel pain that interferes with standing, walking, physical activities, recreational activities, activities of daily living, gait, and overall function. (Tr. 472). On physical examination, she had tenderness to the plantar fascia and displayed hypomobile joints. (Tr. 474-75). Ms. Lumpkin's pre-treatment pain level of 6 decreased to 3 on a 10-point pain scale after treatment. (Tr. 474).

On May 6, 2022, Ms. Lumpkin presented at a telehealth session for a psychiatric diagnostic evaluation, where she reported anxiety, irritability, sadness, crying spells, decreased motivation, fatigue, difficulty concentrating, helplessness, excessive worry, and racing thoughts. (Tr. 462). Certified nurse practitioner Marissa Ragon performed a mental status examination and noted Ms. Lumpkin to be anxious and depressed with a blunted affect. (Tr. 464). NP Ragon determined Ms. Lumpkin's presentation and history of symptoms were consistent with major depressive disorder and generalized anxiety disorder and prescribed Cymbalta. (Tr. 465).

On May 9, 2022, Ms. Lumpkin returned for a second physical therapy session where she demonstrated improvements in pain intensity and gait. (Tr. 470-71). Ms. Lumpkin's pre-treatment pain level of 4 decreased to 2 on a 10-point pain scale after treatment. (Tr. 471).

On May 23, 2022, Ms. Lumpkin demonstrated significant improvement in active ankle range of motion and strength and moderate improvement in standing, walking, physical activity, and recreational activity. (Tr. 706). She continued to show gait impairment and overall function impairment interfering with standing, walking, and physical activity. (*Id.*). On physical examination, Ms. Lumpkin had decreased tissue mobility in the right plantar fascia and posterior tibialis muscle. (Tr. 708).

On May 27, 2022, Ms. Lumpkin presented at a telehealth follow-up visit with NP Ragon and reported tolerating Cymbalta but that her symptoms remained, and her pain severity continued unchanged. (Tr. 679).

After her fourth physical therapy session on June 20, 2022, Ms. Lumpkin was discharged from physical therapy services. (Tr. 703). She demonstrated improved range of motion, strength, joint mobility, and gait mechanics but continued to have heel pain. (*Id.*). The physical examination revealed tenderness at the calcaneal fat pad but was otherwise unremarkable. (Tr. 704-05).

On July 1, 2022, Ms. Lumpkin followed-up with NP Ragon for anxiety and depression. (Tr. 683). She continued to report no significant improvements in mood or pain with Cymbalta. (*Id.*). NP Ragon increased her dosage. (Tr. 684).

On July 5, 2022, Ms. Lumpkin spoke with PA Melillo over the telephone and requested a refill of Lyrica, stating the medications reduced the severity of her low back and right leg symptoms. (Tr. 701). She endorsed tolerating the medications well and without side effects.

(Tr. 702). Ms. Lumpkin also requested a referral for additional physical therapy. (*Id.*). PA Melillo refilled her prescription, referred her for physical therapy, and stated he would consider an MRI if she did not improve. (*Id.*).

On August 8, 2022, Ms. Lumpkin attended a physical therapy evaluation for back pain where she reported increased symptoms with most physical activity and prolonged positions. (Tr. 836-37).

On August 17, 2022, an MRI of Ms. Lumpkin's right ankle showed mild inflammatory signal in the soft tissues of the medial plantar heel adjacent to the calcaneus and Achilles insertion. (Tr. 844).

On August 23, 2022, Ms. Lumpkin returned to Dr. Herbert's office for a follow-up appointment for her heel pain, rated 3 on a 10-point pain scale. (Tr. 803-04). On examination, she had pain with palpation of the right heel. (Tr. 805). Based on the examination and review of the MRI, Dr. Herbert recommended and administered a cortisone injection in the right heel. (*Id.*).

At her next physical therapy session, August 29, 2022, Ms. Lumpkin tolerated the session with decreased symptoms and demonstrated improvement in range of motion. (Tr. 793-94). That day, she presented at a telehealth visit with NP Jones where she reported numbness and electric shock sensations in both hands, worse on the right, and pain in her right heel, right leg, and low back. (Tr. 783). She endorsed stiffness lasting all day, worst in the morning. (*Id.*). NP Jones advised her to continue taking her medications as prescribed and try a neutral wrist splint. (Tr. 789-90).

On August 30, 2022, Ms. Lumpkin called Dr. Herbert's office to report aching foot pain traveling up the Achilles and along the inner ankle since the injection. (Tr. 772). Dr. Herbert's nurse explained that pain flares can occur after injection, and it will get better. (*Id.*).

11

On September 6, 2022, Ms. Lumpkin contacted Dr. Herbert's office again to report aching foot pain and requested other options for pain, including orthotic socks, foot sleeves, and heel insertions. (Tr. 770). Dr. Herbert recommended scheduling an appointment for him to cast orthotics. (*Id.*).

On September 16, 2022, Ms. Lumpkin met with Dr. Herbert and complained of significant heel pain unrelieved by Mobic, ice, heel cups, or cortisone injection. (Tr. 757). The physical examination was unremarkable except for tenderness with palpation of the plantar medial aspect of both heels. (Tr. 758). Dr. Herbert suggested additional physical therapy and provided insoles as a trial to see if orthotics may help her. (*Id.*).

On October 11, 2022, Ms. Lumpkin met with Tanya Johnson, DPM, for a second opinion about her right heel pain. (Tr. 749). She reported always walking in shoes, even around the house, and using insoles, a heel cup, and compression socks. (*Id.*). Dr. Johnson observed an antalgic gait pattern and Ms. Lumpkin endorsed pain with palpation of the medial calcaneal tubercle, worse pain with lateral compression of the right calcaneus, and mild discomfort at the superior medial posterior calcaneus. (Tr. 750). She diagnosed plantar fasciitis and Achilles tendinitis and recommended Voltaren gel two to three times a day for pain. (*Id.*). Dr. Johnson informed Ms. Lumpkin that she cannot take Mobic if she uses the Voltaren gel, as the combination can lead to stomach pain and bleeding ulcers. (*See* Tr. 1080).

On October 26, 2022, Ms. Lumpkin met with orthopedic surgeon Yuji Umeda, M.D., Ph.D., for evaluation of bilateral wrist pain. (Tr. 726). Ms. Lumpkin described intermittent, sharp pain at the radial and ulnar aspect of the wrist and dorsal aspect bilaterally that is exacerbated by pronation and supination and relieved with icing and massage with Voltaren gel. (*Id.*). She also

reported tingling and numbness in her hands and fingers. (*Id.*). For the right wrist, Dr. Umeda noted positive findings on Finkelstein's test for DeQuervain's, Eickhoff test, and tenderness at the ulnar snuff box, the ulnolunate (UL) and ulnotriquetral (UT) ligaments, and the extensor carpi ulnaris (ECU) tendon over the distal ulna. (Tr. 729-30). Neurologic testing revealed diminished light touch sensation in the thumb, the superficial branch of the radial nerve, and the dorsal ulnar aspect of the hand. (Tr. 730). Flexion compression testing over the carpal tunnel was positive for the index, long, and ring fingers; flexion compression testing of the elbow over the cubital tunnel resulted in numbness and tingling of the hand and fingers. (*Id.*). In the left wrist, Dr. Umeda noted positive findings on the Finkelstein's and Eickhoff tests and diminished light touch sensation in the superficial branch of the radial nerve distribution and the dorsal ulnar aspect of the hand. (Tr. 730-31). Dr. Umeda determined the wrist X-rays were within normal limits. (Tr. 731). Dr. Umeda assessed bilateral wrist tendinitis, ECU tendinitis, DeQuervain's disease, and carpal tunnel syndrome of the right wrist and explained Ms. Lumpkin's treatment options, limited to steroid injections and a physical and occupational therapy program. (Tr. 727). Ms. Lumpkin declined the steroid injection but accepted a Medrol Dosepak and agreed to wear a thumb spica brace during the night and daytime as needed. (*Id.*). The steroid provided 60 percent improvement in her symptoms. (*See* Tr. 982).

On December 8, 2022, Ms. Lumpkin sent a message to PA Melillo explaining that she had been rear-ended in mid-November and her back pain had been flaring more since then. (Tr. 714). She described more intense back and leg pain and a current flare up in back, hip, leg, knee, and sciatic pain. (Tr. 713).

On January 11, 2023, in response to Ms. Lumpkin's message requesting a prescription for pain that can be used with Voltaren gel, NP Jones stated she can try up to 3,000 mg of Tylenol per day. (Tr. 1078).

On January 18, 2023, Ms. Lumpkin returned to PA Melillo's clinic and reported worsened low back and right leg pain. (Tr. 968). She completed physical therapy without much improvement and was considering spine injections. (*Id.*). The physical examination showed a normal gait, pain with lumbar extension and flexion, full motor strength throughout the legs, and a positive straight-leg-raise test on the right. (*Id.*). PA Melillo ordered lumbar X-rays and an MRI and continued her prescription for Lyrica. (*Id.*).

That same day, Ms. Lumpkin returned to Dr. Umeda's office to follow-up for bilateral wrist tendinitis, ECU tendinitis, bilateral carpal tunnel syndrome, and bilateral DeQuervain's disease. (Tr. 1052). She reported her symptoms improved with the Medrol Dosepak, but some pain returned once she finished the treatment. (*Id.*). She also stated the thumb spica braces helped as well. (*Id.*). The physical examination revealed tenderness at the ulnar snuff box and over the ECU of the distal ulna bilaterally, but otherwise the findings showed improvement since her visit in October 2022. (Tr. 1054-55).

On January 25, 2023, Ms. Lumpkin spoke with Dr. Desai over the telephone and reported having a flare-up in lupus symptoms, including shoulder and back pain, increased hair-shedding, and minor chest pain that comes and goes. (Tr. 972). Dr. Desai reviewed her most recent lumbar X-ray and noted stable degenerative disc disease at L5-S1 and grade 1 retrolisthesis. (Tr. 975). Dr. Desai also offered additional medication to address lupus-related pain, but Ms. Lumpkin decided to wait until consulting with a functional medicine physician. (Tr. 976). Dr. Desai provided the

14

referral, continued her prescription for hydroxychloroquine, advised her to continue taking Lyrica, amitriptyline, and Flexeril for fibromyalgia, and, noting that Ms. Lumpkin stopped taking Mobic, prescribed Tylenol. (Tr. 975-76).

Ms. Lumpkin's updated lumbar MRI showed a central disc protrusion indenting the thecal sac and abutting the traversing S1 nerve roots, slight facet hypertrophy, mild central canal stenosis, moderate bilateral foraminal stenosis, and type I Modic endplate changes. (Tr. 978-79). PA Melillo reviewed the MRI and, noted the central disc protrusion and facet hypertrophy, discussed epidural steroid and lumbar facet injections. (Tr. 1015). Ms. Lumpkin was hesitant at that time but agreed to call the office if she wished to proceed with injections. (*Id.*).

On February 13, 2023, Ms. Lumpkin messaged Dr. Desai and stated she was discontinuing Voltaren gel so she could stay on Mobic. (Tr. 1011). She explained the Volaten gel did not help her feet and the pain was too much to handle without taking Mobic. (*Id.*).

On February 23, 2023, Ms. Lumpkin met with Dr. Johnson for follow-up of her continued right heel pain. (Tr. 991). She reported worsened pain since the cortisone injection and no relief with physical therapy, a walking boot, injection, orthotics, or heel cup. (*Id.*). Ms. Lumpkin wore a walking boot and walked with an antalgic gait pattern. (*Id.*). She endorsed pain with palpation of the plantar medical calcaneal tubercle and medial calcaneus. (Tr. 992). An updated right foot X-ray showed no significant change compared to March 2022. (Tr. 1004). Ms. Lumpkin refused to wear a cast but agreed to wear a walking boot. (Tr. 992). Dr. Johnson also prescribed custom-made orthotics. (*Id.*).

### III.  Medical Opinions

On June 14, 2022, state agency medical consultant Mehr Siddiqui, M.D., reviewed Ms. Lumpkin's medical records and determined she could lift 20 pounds occasionally, 10 pounds frequently; stand and walk for about six hours in a eight-hour day and sit for about six hours in a eight-hour day; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, stoop, and crawl; and had limitations in handling and fingering bilaterally. (Tr. 266-67). Dr. Siddiqui based his opinion on Ms. Lumpkin's history of lupus and spinal stenosis. (*Id.*). He determined Ms. Lumpkin's statements about the severity of her functional limitations are only partially consistent because she claimed to have pain in her foot, but the X-ray was normal. (Tr. 265-66). On August 16, 2022, Diane Manos, M.D., reviewed additional medical records and offered the same assessment. (Tr. 274-75).

On December 14, 2020, NP Jones provided a letter to Ms. Lumpkin certifying that she was under his care for lupus, fibromyalgia, and lumbar spinal stenosis and degenerative disc disease. (Tr. 949). He stated Ms. Lumpkin's back pain is most consistent with lumbar stenosis, her joint pain is consistent with lupus, and her diffuse muscle pain is consistent with fibromyalgia and indicated by positive findings at all 18 trigger points. (*Id.*).

### IV.  Relevant Testimonial Evidence

Ms. Lumpkin cannot work because of degenerative disc disease in her lumbar spine, lupus, fibromyalgia, Achilles tendonitis and plantar fasciitis of the right foot, tendonitis of the bilateral wrists, and carpal tunnel syndrome in the right wrist. (Tr. 224). She is never pain-free but has good days and bad days. (Tr. 230). She can sustain physical activity for about thirty minutes at a time

16

and sometimes struggles to sit for longer than ten minutes without fidgeting or getting up to stretch. (Tr. 227). She can lift and carry up to five pounds. (*Id.*).

Ms. Lumpkin wears a boot on her right foot all the time. (Tr. 228). It helps relieve pain from her Achilles tendonitis but it does not help reduce her heel pain. (*Id.*). The uneven gait from wearing one boot causes discomfort in her knee, back, and hip. (*Id.*). Ms. Lumpkin uses a TENS unit up to three times a day when she has a flare-up of pain. (Tr. 229). She wears wrist braces at night about four times a week and wears them during the day as needed. (*Id.*). When wearing the braces, she has trouble holding onto things. (*Id.*). When not wearing the braces, she has issues with repetitive wrist motion causing electric shocks in her fingers, leading to numbness and a loss of sensation in her hands. (*Id.*).

Ms. Lumpkin lives with her son. (Tr. 232). She gets about three to four hours of sleep a night and wakes up feeling fatigued and stiff. (Tr. 231). Her morning stiffness improves but it never goes away completely. (*Id.*). In addition to taking muscle relaxers, Ms. Lumpkin takes Tylenol and uses heat on her back and ice on her knees and foot. (Tr. 231-32). She does some household chores when she can, but her son helps a lot with chores and meal preparation. (Tr. 233-34). She goes to the grocery store twice a month and her children go for her if she needs anything else. (Tr. 233). When she has a flare-up, Ms. Lumpkin cannot clean, go to the store, or do much of anything because she is in so much pain; she mostly stays in bed. (Tr. 233-34).

The VE then testified that a person of Ms. Lumpkin's age and education, with the functional limitations described in the ALJ's RFC determination, could perform work as a cashier II, cafeteria attendant, or housekeeping cleaner. (Tr. 236-37). The VE also testified that employers

tolerate time off task at no more than 15% of the workday and no more than one absence per month. (Tr. 237-38).

## V.      Other Relevant Evidence

Ms. Lumpkin completed an Adult Function Report describing how her conditions limit her activities. (Tr. 399-407). There, she described a limited lifestyle with day-to-day variation dependent on the intensity of her pain. (*Id.*). At times, Ms. Lumpkin needs assistance getting out of the shower and getting up from a seated position. (Tr. 401). Some days she can perform light household chores and other days she cannot. (Tr. 402). Her social life is limited to spending time with her two children. (Tr. 403). Stress causes painful flare-ups and fatigue. (Tr. 405). Ms. Lumpkin noted her conditions can affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, remember, complete tasks, concentrate and understand, follow instructions, use her hands, and get along with others. (Tr. 406). Each day is different and multiple conditions contribute to her pain, making it difficult to specify exactly how long and how often she can typically perform daily activities. (Tr. 401-02, 406).

### STANDARD FOR DISABILITY

Eligibility for benefits depends on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520— to determine whether a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Lumpkin had not engaged in substantial gainful activity since April 5, 2022, the application date. (Tr. 203). At Step Two, the ALJ identified Ms. Lumpkin's severe impairments as follows: lumbar spine degenerative disc disease, cutaneous lupus, tendinitis in the bilateral wrists, and right carpal tunnel syndrome. (*Id.*). The ALJ noted Ms. Lumpkin's diagnosis of fibromyalgia but determined that some of her symptoms could be

attributed to her other conditions.[3] At Step Three, the ALJ found Ms. Lumpkin's impairments did not meet the requirements of, or were medically equivalent to, a listed impairment. (Tr. 205).

Then, the ALJ determined Ms. Lumpkin's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; occasionally stoop and crawl; frequently handle and finger bilaterally, and no work operating dangerous moving equipment such as power saws and jack hammers, and no commercial driving.

(Tr. 207). The ALJ then determined Ms. Lumpkin has no past relevant work. (Tr. 213). At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that Ms. Lumpkin can perform, including cashier II, cafeteria attendant, and housekeeping cleaner. (*Id.*). Therefore, the ALJ found Ms. Lumpkin was not disabled. (Tr. 215).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833

---

[3]     SSR 12-2p indicates that fibromyalgia is a medically determinable impairment if the claimant has a history of widespread pain, at least 11 tender points, or repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, and *evidence that other disorders that could cause the symptoms and signs were excluded. See* 2012 WL 310489, at *2-3 (Soc. Sec. Admin. July 25, 2012). Lupus is characterized by similar symptoms of joint and muscle pain and fatigue. *See Lupus, Cleveland Clinic,* https://my.clevelandclinic.org/health/diseases/4875-lupus (last accessed Nov. 5, 2024). Ms. Lumpkin was diagnosed with both conditions. As such, the ALJ determined fibromyalgia was not medically determinable impairment and attributed all of Ms. Lumpkin's symptoms to her other conditions. In so doing, as described below, the ALJ freed herself from analyzing any symptoms in the context of fibromyalgia.

(6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

Along with considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and

thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Ms. Lumpkin argues the ALJ erred in assessing her RFC because the ALJ did not properly analyze her symptoms under the correct legal standard and did not incorporate limitations that were supported by the medical record, including a limitation to occasionally fingering and handling. (ECF #12 at PageID 1132-33). The Commissioner responds that the ALJ did not err in the analysis of Ms. Lumpkin's symptoms and the conclusions are supported by substantial evidence. (ECF #14 at PageID 1145, 1148). For the following reasons, I conclude the ALJ did not properly evaluate Ms. Lumpkin's symptoms. Because the issue is dispositive of the case and requires remand, I decline to address Ms. Lumpkin's other arguments.

In evaluating a claimant's subjective reports of symptoms, SSR 16-3p provides that an ALJ must consider the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence. 2017 WL 5180304, at *5-8 (Oct. 25, 2017). In addition, the ALJ uses the factors set forth in 20 C.F.R. § 416.929(c)(3) to evaluate the claimant's statements. These are:

1.    A claimant's daily activities;

2.    The location, duration, frequency, and intensity of pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6.    Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7.    Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors, only those germane to the alleged symptoms. *See Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005).

The ALJ is not required to accept the claimant's subjective complaints and may discount subjective testimony when the ALJ finds the complaints are inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. But the ALJ will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. SSR 16-3p, at *5. Similarly, the ALJ may not reject an individual's statements about her symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged but must carefully consider other evidence in the record. *See* 20 C.F.R. §416.929(c)(2); *see also* SSR 16-3p, at *6. In reviewing an ALJ's evaluation of an individual's symptoms, the court is limited to evaluating whether the ALJ's explanations for discrediting an individual's testimony are reasonable and supported by substantial evidence in the record. *Jones*, 336 F.3d at 476.

23

Here, the ALJ summarized Ms. Lumpkin's statements about her symptoms:

The claimant alleged disability due to lupus, fibromyalgia, sciatica, tendinitis, depression, anxiety, spinal stenosis, and Achilles tendinitis of the right foot. As of May 2022, the claimant has continued to use a walking boot on her right foot due to ongoing symptoms, experienced more left ankle and foot issues due to favoring the right side, noted more difficulty with standing and walking and inability to climb stairs, more pain and swelling in wrists and fingers, difficulty holding things, increased tenderness, worsening fatigue, and a new prescribed medication due to more anxiety and mood swings. She reported more difficulty doing even simple tasks around the house, for example, standing to cook so she takes breaks or uses a chair and has difficulty gripping and cutting things, receives assistance from her son with cooking and cleaning and going to the store, cannot lift bags, walks slowly around the store, and takes more naps during the day. As of September 2022, the claimant's impairments allegedly continued to worsen, and combined effects of medical impairments caused her to be very limited.

The claimant reported constant pain and fatigue, has difficulty functioning properly, is anxious and irritable, and medications make her feel disoriented and affect ability to pay attention and follow instructions. She described difficulty with daily activities at times, for example, dressing, getting out of the shower, caring for hair, lack of appetite, cooking, performing household chores and yard work, participating in social activities, and getting along with others.

The claimant testified she can sit for 10 minutes, walk for 10 minutes, lift/carry five pounds. Treatment has included cortisone shots for her right foot but that made symptoms worse, left foot is acting up, and she wears a boot on her right foot that impacts balance, knees, and back. She uses a TENS unit daily and prescribed braces for both wrists. The claimant further testified she experiences flare-ups four times a week that feels like pins and needles, morning sickness, and difficulty sleeping due to pain. Side effects from medications include loopy feeling, dizziness, and light-headedness. She states she has issues with personal care, participates in no social activities, and has good days and bad days.

(Tr. 207-08) (citations omitted). After the ALJ summarized the medical evidence, she determined Ms. Lumpkin's impairments could reasonably be expected to produce the alleged symptoms, but the intensity of the symptoms and impact on functioning are not consistent with the totality of the evidence:

As such, the medical record does not establish functional limitations that would preclude the light exertional level with the additional restrictions stated above.

24

Despite allegations of limitations, test results showed stability and no significant worsening. The claimant has maintained intact system functioning as demonstrated during examinations that showed no acute distress, regular heart rate and rhythm, clear lungs, 5/5 strength, normal muscle tone and bulk, intact sensation, intact neurological functioning, and normal coordination, antalgic but steady gait or normal gait, no evidence of a prescribed or medically necessary assistive device, cooperative behavior, full orientation, and ability to provide information, answer questions, and follow instructions. Moreover, despite allegations and some continued symptoms, the claimant's course of treatment remained conservative and provided stability.

The undersigned is cognizant that the degree of limitation that a person might experience from impairments might not necessarily be reflected in a particular treatment note; however, in the instant matter, the longitudinal record does not reflect a significant degree of functional limitations from the claimant's impairments. Examination findings also do not support loss of strength, range of motion, sensation, reflexes, coordination, behavior, or cognitive deficits that would support a disabling degree of limitation. The medical evidence, even with a consideration of limitations from pain, does not support a greater degree of limitation than that which is set forth in the above residual functional capacity assessment.

In sum, the claimant's alleged functional limitations are not entirely consistent with the claimant's reported daily functioning, the examinations of record, and the persuasive portions of the medical opinions. Nonetheless, the above evidence supports that the claimant has experienced the degree of limitation reflected in the residual functional capacity assessment above and discussed above. Thus, light exertion as well as postural, manipulative, and environmental hazard limitations account for the claimant's combined physical impairments and any deficits due to fatigue, pain, tenderness, stiffness, and reduced range of motion. Accordingly, the undersigned finds the record does not establish limitations that would preclude work activity within the residual functional capacity defined in this section.

(Tr. 210-11). In short, the ALJ discredited Ms. Lumpkin's statements about the severity of her symptoms and the degree to which they functionally limit her because her statements were inconsistent with her reported daily functioning, she had largely normal physical examinations, and underwent conservative treatment. Under this court's scope of review, I now look to whether the ALJ's explanations for discrediting Ms. Lumpkin's statements about her symptoms are reasonable and supported by substantial evidence in the record. *Jones*, 336 F.3d at 476. If they are

25

reasonable and substantially supported, the ALJ did not err in her assessment of Ms. Lumpkin's RFC.

There is conflicting evidence regarding Ms. Lumpkin's ability to perform activities of daily living. First, there are general statements in psychiatric records in May and July of 2022 concluding that "Angela manages her ADLs and IADLs independently." (Tr. 680, 684). There is no context in the record to explain the basis for these statements. The ALJ appears to have accepted these statements as true, having utilized them to support her conclusion that Ms. Lumpkin has only a mild limitation in adapting or managing herself. (Tr. 204).

But Ms. Lumpkin's statements about her daily activities are more nuanced than the ALJ presents them. In physical therapy records from April to June 2022, Ms. Lumpkin professed impairment in performing activities of daily living and physical activity in general; therefore, one of her goals in physical therapy was to increase her ability to "stand and walk for [more than] 1 hour to perform activities of daily living." (Tr. 473). In another round of physical therapy in August 2022, Ms. Lumpkin again claimed impairment in performing activities of daily living. (Tr. 836). The ALJ acknowledged that Ms. Lumpkin attended physical therapy but did not address the contents of those records. (Tr. 210). Elsewhere in the ALJ's decision, the ALJ noted Ms. Lumpkin can drive, read, shop, spend time with family, leave the home independently, take care of personal needs, and interact with providers. (Tr. 204, 206).

In general, Ms. Lumpkin states she can sustain physical activity for about a half-hour at a time. (Tr. 227). On good days, she can engage in light household chores, eat, read, watch television, sleep, stretch, pray, drive, and go to the grocery store twice a month for about a half-hour. (Tr. 399-406). Ms. Lumpkin testified her son, with whom she lives, provides significant help

with household chores and meal preparation and provides assistance with personal care when necessary. Ms. Lumpkin's independent excursions from the home consist of grocery shopping twice a month and attending medical appointments. On bad days, the pain is so great that she stays in bed. (Tr. 401). These statements demonstrate the ALJ's description inappropriately mischaracterized Ms. Lumpkin's testimony regarding the scope of her daily activities. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248-49 (6th Cir. 2007) (finding an ALJ's use of plaintiff's daily activities to discount her statements was inappropriate because the ALJ mischaracterized the plaintiff's testimony regarding the scope of her daily activities). Moreover, while the ALJ acknowledged Ms. Lumpkin has good days and bad days, the ALJ did not address her statement that on bad days, she remains in bed and is not able to perform those limited daily activities at all. As bad days occur several times a week, it is possible, in accordance with the VE's testimony, that Ms. Lumpkin could be precluded from full-time, competitive work if she requires more than one absence a month. "If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

Next, the ALJ determined Ms. Lumpkin's largely normal physical examinations were inconsistent with her complaints of pain. In the context of many medical conditions, a record bereft of, or with few instances of, abnormal clinical findings can, along with other evidence, constitute substantial evidence supporting an ALJ's evaluation of a claimant's symptoms. *See* SSR 16-3p, 2017 WL 5180304, at *5 ("A report of minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors [the ALJ] must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms").

Finally, the ALJ concluded that Ms. Lumpkin's treatment was conservative. Under the guidance in SSR 16-3p, persistent attempts to obtain relief, such as increasing dosages, changing medications, trying a variety of treatments, and referrals to specialists "may be an indication that an individual's symptoms are a source of distress and may show that they are intense or persistent." SSR 16-3p, at *9. On the other hand, if the frequency or extent of the treatment sought is not comparable with the degree of the individual's subjective complaints, or if the individual does not follow treatment that might improve symptoms, an ALJ may find the alleged intensity and persistence of the symptoms are inconsistent with the overall evidence of record. *Id.* Here, Ms. Lumpkin's treatment was conservative but, as it relates to lupus, treatment consists of medications to manage symptoms. *See Lupus, Cleveland Clinic,* https://my.clevelandclinic.org/health/diseases/4875-lupus (last accessed Nov. 5, 2024). Even when Ms. Lumpkin continued to complain of lupus-related symptoms despite medication compliance, her treating providers continued to only prescribe medication. As it relates to her degenerative disc disease, no treating provider suggested more aggressive treatment such as surgery. Without some indication that the ALJ relied on non-compliance with treatment or a refusal to engage in treatment that could reduce pain, the ALJ's use of conservative treatment to discount Ms. Lumpkin's complaints of pain is unreasonable.

Because the ALJ's evaluation of Ms. Lumpkin's symptoms does not comport with the applicable legal standards, I cannot determine whether her analysis is supported by substantial evidence.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I

**REVERSE** the Commissioner's decision denying supplemental security income and **REMAND**

the matter for additional proceedings.

Dated: November 7, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE